305 Ga. 348
FINAL COPY

S18A1211. PARK v. THE STATE.

MELTON, Chief Justice.

We granted an interlocutory appeal in this case to address Joseph Park's facial challenge to the constitutionality of OCGA § 42-1-14, which requires, among other things, that a person who is classified as a sexually dangerous predator — but who is no longer in State custody or on probation or parole — wear and pay for an electronic monitoring device linked to a global positioning satellite system ("GPS monitoring device") that allows the State to monitor that individual's location "for the remainder of his or her natural life." Id. at (e). For the reasons that follow, we conclude that OCGA § 42-1-14 (e), on its face, authorizes a patently unreasonable search that runs afoul of the protections afforded by the Fourth Amendment to the United States Constitution, and, as a result, subsection (e) of the statute is unconstitutional to the extent that it does

so.[1]

By way of background, in 2003, Park was convicted of child molestation and nine counts of sexual exploitation of a minor. Park was sentenced to twelve years in prison with eight years to serve. Upon his release from custody in April 2011, the Sexual Offender Registration Review Board ("SORRB") classified Park as a "sexually dangerous predator" under OCGA § 42-1-14 (a) (1),[2] which was a designation that required Park to wear and pay for an electronic monitoring system for the remainder of his natural life. Id. at (e).

Following his release on probation, Park sought reevaluation of his classification, but the SORRB upheld his classification. See OCGA § 42-1-14 (b). Park then sought judicial review of the agency decision in Fulton County Superior Court pursuant to OCGA § 42-1-14 (c), claiming that his classification

---

[1] Because we find that OCGA § 42-1-14 (e) is unconstitutional to the extent that it runs afoul of the Fourth Amendment, we need not address the additional grounds upon which Park challenges the constitutionality of the electronic monitoring requirements created by the statute.

[2] The SORRB classifies sexual offenders based on how likely they are to "engage in another crime against a victim who is a minor or a dangerous sexual offense." OCGA § 42-1-14 (a) (1). Although OCGA § 42-1-14 was amended in 2012, 2013, 2015, and 2016, the 2011 version under which Park was classified is identical to the current version of the statute for classification purposes.

violated his due process rights, and that the classification constituted ex post facto punishment because it would require him to be monitored through a wearable GPS monitoring device. The superior court upheld his classification, and Park's application for a discretionary appeal from the superior court's ruling was denied by this Court. With that, Park's classification as a sexually dangerous predator became final, and he is now required to wear a GPS monitoring device for the rest of his life.

Following a violation of his probation in November 2011, Park's probation was revoked and he was returned to prison. Park completed the remainder of his sentence and he was released from custody in April 2015. Thereafter, he registered as a sex offender with the DeKalb County Sheriff's Office pursuant to OCGA § 42-1-12 (e) and (f), and he was fitted with a GPS monitoring device pursuant to OCGA § 42-1-14 (e).[3] In February 2016, Park

---

[3] The specific device was an ankle monitor that was designed to track Park's position at all times, and the device was provided by a private company called VeriTrax. VeriTrax, as the monitoring company, would alert the Sheriff's Department if it received a transmission about any irregularities with respect to the monitoring device. For example, if someone tried to damage the monitoring device, a "master tamper alert" would be transmitted via a cell phone tower signal to VeriTrax, and VeriTrax would inform the Sheriff's Department. Park could shower while wearing the device, but it was not recommended that he

was arrested and indicted for tampering with his ankle monitor, in violation of OCGA § 16-7-29 (b) (5) (prohibiting removal, destruction, or circumvention of a monitor worn pursuant to OCGA § 42-1-14). Park filed a general demurrer, arguing that he could not be prosecuted under OCGA § 16-7-29 (b) (5) because the predicate statute, OCGA § 42-1-14, was unconstitutional. Some of the grounds upon which Park challenged OCGA § 42-1-14 related to his 2011 classification as a sexually dangerous predator.[4] However, he also raised constitutional claims challenging the required electronic monitoring imposed by OCGA § 42-1-14 (e) with respect to those who have been classified as sexually dangerous predators.[5] Following a September 26, 2017 hearing, the trial court

swim with the device, as the monitor was not designed to be submerged in water on a constant basis. Park also had to charge the ankle monitor at least twice a day for a minimum of thirty minutes per day.

[4] These claims included assertions that the classification procedure under OCGA § 42-1-14 deprived him of due process, the statute deprived him of equal protection by treating him differently from other convicted criminals, the statute was unconstitutionally vague with respect to the standard for designating an individual as a sexually dangerous predator, the classification constituted ex post facto punishment, and the statute violated double jeopardy principles by subjecting Park to additional punishment that had not been imposed in his original sentence.

[5] Specifically, Park claimed that OCGA § 42-1-14 (e) violated his right against unlawful search and seizure under the Fourth Amendment to the United

found OCGA § 42-1-14 to be constitutional and overruled Park's demurrer, but granted a certificate of immediate review. We granted Park's application for an interlocutory appeal to determine whether the trial court erred in rejecting Park's claim that OCGA § 42-1-14 is unconstitutional.

1. As an initial matter, Park's constitutional claims relating to his classification as a sexually dangerous predator are barred by res judicata, and they will not be addressed on the merits here. Park raised constitutional due process and ex post facto claims with regard to his classification under OCGA § 42-1-14 in his failed 2011 petition to be reevaluated. Indeed, he specifically raised these constitutional challenges in this Court when he filed an application to appeal from the denial of his petition, and this Court declined to review those challenges. Because those claims were already decided against him, and his additional "constitutional challenges to the statutory provisions regarding classification . . . could and should have been raised in [Park's] petition for

_____

States Constitution and under the Georgia Constitution, violated his right to privacy under the Georgia Constitution, violated his right against self-incrimination by forcing him to disclose his location to law enforcement, violated his right against cruel and unusual punishment, was an ex post facto law, and created an unlawful taking by requiring him to pay for the electronic monitoring.

judicial review of the Board's classification," he is precluded from raising them here. See Sexual Offender Registration Review Bd. v. Berzett, 301 Ga. 391, 394 (801 SE2d 821) (2017). See also Coen v. CDC Software Corp., 304 Ga. 105, 112 (2) (816 SE2d 670) (2018). Accordingly, those portions of the trial court's order relating to the classification procedures of OCGA § 42-1-14 are affirmed.

2. Turning to the constitutional issue properly before us, Park contends that OCGA § 42-1-14 (e) is unconstitutional on its face because it authorizes an unreasonable lifelong warrantless search of sex offenders who are classified as sexually dangerous predators by requiring such offenders to wear and be monitored at all times through a GPS monitoring device. In evaluating this claim,

> we recognize at the outset that all presumptions are in favor of the constitutionality of an Act of the legislature and that before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be constitutional until the contrary appears, the burden is on the party alleging a statute to be unconstitutional to prove it.

(Citation and punctuation omitted.) JIG Real Estate, LLC v. Countrywide Home Loans, Inc., 289 Ga. 488, 490 (2) (712 SE2d 820) (2011). Furthermore,

outside the First Amendment overbreadth context, a plaintiff can succeed in a facial challenge only by establishing that no set of circumstances exists under which the statute would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that the statute lacks a plainly legitimate sweep.

(Citation and punctuation omitted.) Blevins v. Dade County Bd. of Tax Assessors, 288 Ga. 113, 118 (3) (702 SE2d 145) (2010). With these principles in mind, we turn to the constitutional question at issue.

(a) Does the required GPS monitoring authorized by OCGA § 42-1-14 (e) qualify as a search under the Fourth Amendment?

To begin our analysis, we must first address whether the requirements of OCGA § 42-1-14 (e) create a search for purposes of the Fourth Amendment. Subsection (e) states:

Any sexually dangerous predator shall be required to wear an electronic monitoring system that shall have, at a minimum:
(1) The capacity to locate and record the location of a sexually dangerous predator by a link to a global positioning satellite [GPS] system;
(2) The capacity to timely report or record a sexually dangerous predator's presence near or within a crime scene or in a prohibited area or the sexually dangerous predator's departure from specific geographic locations; and
(3) An alarm that is automatically activated and broadcasts the sexually dangerous predator's location if the global positioning satellite monitor is removed or tampered with by anyone other than a law enforcement official designated to maintain and remove or replace the equipment.

7

Such electronic monitoring system shall be worn by a sexually dangerous predator *for the remainder of his or her natural life. The sexually dangerous predator shall pay the cost of such system to the Department of Community Supervision if the sexually dangerous predator is under probation or parole supervision and to the sheriff after the sexually dangerous predator completes his or her term of probation and parole* or if the sexually dangerous predator has moved to this state from another state, territory, or country. The electronic monitoring system shall be placed upon the sexually dangerous predator prior to his or her release from confinement. If the sexual offender is not in custody, within 72 hours of the decision classifying the sexual offender as a sexually dangerous predator in accordance with subsection (b) of this Code section, the sexually dangerous predator shall report to the sheriff of the county of his or her residence for purposes of having the electronic monitoring system placed on the sexually dangerous predator.

(Emphasis supplied.)

In simpler terms, OCGA § 42-1-14 (e) requires all sex offenders classified as sexually dangerous predators to wear a GPS monitoring device that locates, records, and reports their location to State authorities, even after they have completed their criminal sentences. The United States Supreme Court has held that such requirements imposed by the State constitute a search for purposes of the Fourth Amendment. See Grady v. North Carolina, U. S. (135 SCt 1368, 1370, 191 LE2d 459) (2015) (State monitoring of a sex offender through a GPS ankle bracelet that the offender was required to wear at all times

8

constituted a search, as "a State . . . conducts a  search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements."). See also Gregory v. Sexual Offender Registration Review Bd., 298 Ga. 675, 688 (3) (784 SE2d 392) (2016). Based on the Grady decision, OCGA § 42-1-14 (e), on its face, authorizes a search that implicates the Fourth Amendment. Grady, supra,     U. S.     135 SCt at 1371.

(b) Is the search reasonable?

Next, we must determine whether "no set of circumstances exists under which [OCGA § 42-1-14 (e)] would" allow for a reasonable search that does not run afoul of Fourth Amendment protections. See Blevins, supra, 288 Ga. at 118 (3). In other words, the fact that OCGA § 42-1-14 (e) creates a program for tracking individuals through worn GPS monitoring devices and qualifies as a search under the Fourth Amendment

> does not decide the ultimate question of the program's constitutionality. The Fourth Amendment prohibits only unreasonable searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.

(Citations and emphasis omitted.) Grady, supra,     U. S.     135 SCt at 1371.

9

Accordingly, we must determine if a lifelong search of the individuals required to wear a GPS monitoring device pursuant to OCGA § 42-1-14 (e) is reasonable. As explained more fully below, we find that the specific search created by OCGA § 42-1-14 (e) cannot stand under the Fourth Amendment, at least with respect to individuals who have completed their criminal sentences.

In order to address this issue, we must keep in mind that the Fourth Amendment to the United States Constitution sets forth the important "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U. S. Const. amend. IV. And "the Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers." (Citations omitted.) Vernonia School Dist. 47J v. Acton, 515 U. S. 646, 652 (II) (115 SCt 2386, 132 LE2d 564) (1995). "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." (Citation omitted.) Chandler v. Miller, 520 U. S. 305, 313 (II) (117 SCt 1295, 137 LE2d 513) (1997). In this regard, a reasonable search generally requires that law enforcement officials obtain a judicial warrant based on a showing of probable cause indicating that a person to be seized has committed a crime or that a place to be searched contains

10

evidence of a crime. See Skinner v. Railway Labor Executives' Assn., 489 U. S. 602, 619 (III) (A) (109 SCt 1402, 103 LE2d 639) (1989). See also U. S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

Pursuant to the Grady decision, supra, there are two relevant issues that must be addressed here in order for us to determine whether the warrantless searches authorized by OCGA § 42-1-14 (e) may be permissible: (1) whether the searches involved may be reasonable under the Fourth Amendment due to the individuals being searched having a diminished expectation of privacy, and (2) whether the warrantless searches authorized by the statute may be permissible based on "special needs." See Grady, supra, U. S. 135 SCt at 1371. We address each of these matters in turn.

(i) *Diminished expectation of privacy*.

The State contends that a lifelong GPS search of an individual classified as a sexually dangerous predator is reasonable because, like a person who is on probation or parole, a sexually dangerous predator has a diminished expectation of privacy with respect to Fourth Amendment searches. See, e.g., Samson v.

11

California, 547 U. S. 843, 852 (III) (126 SCt 2193, 165 LE2d 250) (2006) (parolees who submit to suspicionless searches by parole officers or peace officers "at any time" as a condition of their parole "have severely diminished expectations of privacy by virtue of their status alone"). However, the Supreme Court cases cited by the State concern individuals who are *still serving a criminal sentence*, either on probation or on parole. Those cases have no application here to the extent that OCGA § 42-1-14 (e) specifically and expressly authorizes a lifelong GPS search of individuals, like Park, who *have already served their entire sentences and are no longer on probation or parole*, via the attachment of an electronic monitoring device to their bodies.

It cannot be said that an individual who has completed the entirety of his or her criminal sentence, including his or her parole and/or probation requirements, would have the same diminished privacy expectations as an individual who is *still* serving his or her sentence. In this regard, as we held in Jones v. State, 282 Ga. 784 (653 SE2d 456) (2007), even individuals who have pled guilty to a crime and who are serving a probated sentence, but who were *not given notice* that warrantless searches would be included as a condition of their probation, do not have a diminished expectation of privacy with respect to

12

a search covered by the Fourth Amendment. See id. at 788. This is because a defendant's "status as a probationer, standing alone, cannot serve as a substitute for a search warrant." Id. Nor is a person who is on parole in the same position as one who is no longer serving a sentence of any kind, as a parolee is still actively serving his or her sentence for the crime or crimes that the person has committed, whereas a free person, obviously, is not. See Morrissey v. Brewer, 408 U. S. 471, 477 (I) (92 SCt 2593, 33 LE2d 484) (1972) ("The essence of parole is release from prison, *before the completion of sentence*, on the condition that the prisoner abide by certain rules during the balance of the sentence.") (emphasis supplied).

We are also not persuaded by the State's argument that an individual who is classified as a sexually dangerous predator would have a diminished expectation of privacy because that person is also subject to the civil regulatory requirements that come along with the status of being a sexual offender. While the registration requirements of OCGA § 42-1-12 reveal information such as the convicted sex offender's address and restrict certain areas where the offender may be legally present — even after that individual is no longer serving a sentence — this has nothing to do with State officials *searching* that individual

by attaching a device to his body and constantly tracking that person's movements in order to look for evidence of a crime without a warrant. See generally id.

The permanent application of a monitoring device and the collection of data by the State about an individual's whereabouts twenty-four hours a day, seven days a week, through warrantless GPS monitoring for the rest of that individual's life, even after that person has served the entirety of his or her criminal sentence, constitutes a significant intrusion upon the privacy of the individual being monitored. See, e.g., United States v. Jones, 565 U. S. 400, 407 (132 SCt 945, 181 LE2d 911) (2012) (Fourth Amendment jurisprudence, which was tied to common law trespass until the latter half of the twentieth century, was expanded to include an analysis of whether a violation occurred based on government officers violating a person's reasonable expectation of privacy.). See also id. at 415 (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."). Moreover, as discussed in further detail below, the purpose of these searches is to collect evidence of potential criminal wrongdoing that can

later be used against the individuals being searched. Based on the foregoing, we must conclude that individuals who have completed their sentences do not have a diminished expectation of privacy that would render their search by a GPS monitoring device reasonable. See, e.g., Vernonia School Dist. 47J, supra, 515 U. S. at 653 (II) ("Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant.").

(ii) *Special needs searches.*

Although individuals classified as sexually dangerous predators do not have a diminished expectation of privacy after they have served the entirety of their sentences, this does not end our inquiry, as we still must determine if the GPS monitoring requirements of OCGA § 42-1-14 (e) may be proper as a reasonable "special needs" search. In this regard,

> [s]earch regimes where no warrant is ever required may be reasonable where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" Skinner, [supra,] 489 U. S. at 619 . . . (quoting Griffin v. Wisconsin, 483 U. S. 868, 873 (107 SCt 3164, 97 LE2d 709) (1987) (some internal quotation marks omitted)), and where the "primary purpose" of the searches is "[d]istinguishable from the general interest in crime control," Indianapolis v. Edmond, 531 U. S. 32, 44 (121 SCt 447, 148 LE2d 333) (2000).

15

City of Los Angeles v. Patel,    U. S.    (III) (A) (135 SCt 2443, 2452, 192 LE2d 435) (2015). See also Griffin v. Wisconsin, 483 U. S. 868, 873 (II) (A) (107 SCt 3164, 97 LE2d 709) (1987) (Suspicionless searches may be proper "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.") (citation and punctuation omitted). Notably, the special needs doctrine is a "closely guarded" exception to the warrant requirement that only applies to a limited "class of permissible suspicionless searches." (Citation and punctuation omitted.) Ferguson v. City of Charleston, 532 U. S. 67, 80 (III) n.17 (121 SCt 1281, 149 LE2d 205) (2001). Indeed, in order for the special needs exception to apply, the purpose advanced to justify the warrantless search must be "divorced from the State's general interest in law enforcement." Id. at 79 (III).

When determining whether the purpose of the searches involved is distinguishable from a general interest in crime control, we review the primary purpose of the searches at the programmatic level (see Williams v. State, 293 Ga. 883, 891 (3) (b) (750 SE2d 355) (2013) (police checkpoints)), and must "consider all the available evidence in order to determine the relevant primary purpose." Ferguson, supra, 532 U. S. at 81 (III). See also Nicholas v. Goord, 430

16

F3d 652, 663 (2d Cir. 2005) ("We thus read Edmond and Ferguson to call for the application of the special-needs test in cases involving suspicionless searches, and to require that such searches serve as their immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation."). When it is determined that a special need exists, we must then look to the reasonableness of the special needs search, which "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." (Citation and punctuation omitted.) United States v. Knights, 534 U. S. 112, 119 (122 SCt 587, 151 LE2d 497) (2001).

The State contends that the GPS monitoring of OCGA § 42-1-14 (e) serves a primary purpose that is distinguishable from a general interest in crime control, because the statute serves to prevent recidivism against minor victims or dangerous sexual offenses rather than control criminal activity. See, e.g., Knights, 534 U. S. at 120. However, the plain language of OCGA § 42-1-14 (e) reveals that this purpose is not "divorced from the State's general interest in law enforcement." Ferguson, supra, 532 U. S. at 79 (III). Specifically, the statute requires that the monitoring system involved be capable of "timely report[ing]

17

or record[ing] a sexually dangerous predator's presence near or within a crime scene" without limitation to any type of crime. Id. at (e) (2). Further, the location information collected is immediately reported to law enforcement, and the statute does not restrict law enforcement's use of that information as evidence that the monitored person committed a crime of any specific kind. While it is true that the information collected through the use of worn GPS monitoring devices does not *only* collect evidence that could be later used in a criminal prosecution, the devices are still designed to immediately report evidence of possible criminal activity to State authorities at all times without the need for a search warrant based on probable cause.

> The stark and unique fact that characterizes this case [as one that does not meet the "special needs" exception] is that [the GPS monitoring device is] designed to obtain evidence of criminal conduct by [a person designated as a sexually dangerous predator] that would be turned over to the police and that could be admissible in subsequent criminal prosecutions.

Ferguson, supra, 532 U. S. at 85-86 (III).  And while the State is correct that the potential for recidivism among persons designated as sexually dangerous

predators is a serious problem, "'the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose.'" Id. at 86 (III) (quoting Edmond, 531 U. S. at 42-43). In other words, even if the primary purpose of the statute is to prevent specific types of recidivism, because, under OCGA § 42-1-14's design, that purpose is not "divorced from the State's general interest in law enforcement" (Ferguson, supra, 532 U.S. at 79 (III)) the statute does not authorize a permissible "special needs" search. Compare Vernonia Sch. Dist. 47J, supra, 515 U. S. at 654 (III) ("Special needs" existed in the public school context to justify suspicionless drug testing of student athletes, as policy was reasonable to address possible drug use by children who were "committed to the temporary custody of the State as schoolmaster."); Nat. Treasury Employees Union v. Von Raab, 489 U. S. 656 (109 SCt 1384, 103 LE2d 685) (1989) (random drug testing of federal customs officers who carry arms or are involved in drug interdiction deemed reasonable).

Finally, even if we assume, arguendo, that the State's general interest in crime control and detection is distinguishable from the primary purpose of the search authorized by OCGA § 42-1-14 (e), thereby meeting the requirements for

a special need, the statute still fails to pass constitutional muster. When "special

needs"

> are alleged in justification of a Fourth Amendment intrusion, courts
> must [still] undertake a context-specific inquiry, examining closely
> the competing private and public interests advanced by the parties.
> See Von Raab, [supra,] 489 U. S. at 665-666; see also id., at 668.
> As Skinner[, supra,] stated: "In limited circumstances, where the
> privacy interests implicated by the search are *minimal*, and where
> an important governmental interest furthered by the intrusion would
> be placed in jeopardy by a requirement of individualized suspicion,
> a search may be reasonable despite the absence of such suspicion."
> 489 U. S. at 624.

(Emphasis supplied.) Chandler v. Miller, 520 U. S. 305, 314 (II) (117 SCt 1295,

137 LE2d 513) (1997).

Here, as explained previously, the privacy interests are not minimal. See

Jones, supra, 565 U. S. at 416 (Sotomayor, J., concurring) ("GPS monitoring —

by making available at a relatively low cost such a substantial quantum of

intimate information about any person whom the Government, in its unfettered

discretion, chooses to track — may alter the relationship between citizen and

government in a way that is inimical to democratic society.") (citation and

punctuation omitted). OCGA § 42-1-14 (e) authorizes a twenty-four-hour-a-day,

seven-day-a-week, search of an individual who has already served his or her

20

entire prison sentence that reveals constant information about that person's whereabouts for the remainder of that person's life. Because the privacy interests involved with respect to Fourth Amendment searches of the individuals covered by OCGA § 42-1-14 (e) who are no longer serving any portion of their sentences is by no means minimal, for that reason alone, the search authorized by the statute cannot be classified as a *reasonable* "special needs" search. See Chandler, supra, 520 U. S. at 314 (for special needs doctrine to be applicable, privacy interests implicated in the search must be "minimal").

3. Statutes authorizing a lifelong GPS search of persons classified as sexually dangerous predators have passed constitutional muster in a few other jurisdictions, but OCGA § 42-1-14 (e) is distinguishable from those statutory schemes. For example, OCGA § 42-1-14 (e) does not include the GPS monitoring of sexually dangerous predators as part of the offenders' actual sentences (see People v. Hallak, 310 Mich. App. 555 (873 NW2d 811) (2015), rev'd in part on other grounds, 499 Mich. 879 (876 NW2d 523) (2016) (Michigan statutes at issue specifically included lifetime GPS monitoring as part of the sex offender's *actual sentence for the crime or crimes committed*)). Nor does OCGA § 42-1-14 (e) on its face allow for individuals classified as sexually

dangerous predators to be removed from the GPS monitoring requirements at

any point after the classification has become final.[6] See N.C. Gen. Stat. §

_____

[6] Once an individual's classification as a sexually dangerous predator has become final, OCGA § 42-1-14 does not, on its face, provide any method for that individual to be removed from that category of offenders and reclassified in a way that would relieve that person of wearing a GPS monitoring device "for the remainder of his or her natural life." Id. at (e). In this regard, the only reclassification procedures in the statute appear in subsections (b) and (c), which provide:

> (b) If the board determines that a sexual offender should be classified as a Level II risk assessment classification or as a sexually dangerous predator, the sexual offender may petition the board to reevaluate his or her classification. To file a petition for reevaluation, the sexual offender shall be required to submit his or her written petition for reevaluation to the board *within 30 days from the date of the letter notifying the sexual offender of his or her classification*. The sexual offender shall have 60 days from the date of the notification letter to submit information as provided in subsection (a) of this Code section in support of the sexual offender's petition for reevaluation. *If the sexual offender fails to submit the petition or supporting documents within the time limits provided, the classification shall be final*. The board shall notify the sexual offender by first-class mail of its decision on the petition for reevaluation of risk assessment classification and shall send a copy of such notification to the Georgia Bureau of Investigation, the Department of Corrections, the Department of Community Supervision, the sheriff of the county where the sexual offender is registered, and the sentencing court, if applicable.
> (c) A sexual offender who is classified by the board as

14-208.43 (a) (North Carolina statute allows for sexual offenders to "file a request for termination of [the] monitoring requirement . . . one year after the offender: (i) has served his or her sentence for the offense for which the

a Level II risk assessment classification or as a sexually dangerous predator may file a petition for judicial review of his or her classification *within 30 days of the date of the notification letter or, if the sexual offender has requested reevaluation pursuant to subsection (b) of this Code section, within 30 days of the date of the letter denying the petition for reevaluation*. The petition for judicial review shall name the board as defendant, and the petition shall be filed in the superior court of the county where the offices of the board are located. Within 30 days after service of the appeal on the board, the board shall submit a summary of its findings to the court and mail a copy, by first-class mail, to the sexual offender. The findings of the board shall be considered prima-facie evidence of the classification. The court shall also consider any relevant evidence submitted, and such evidence and documentation shall be mailed to the parties as well as submitted to the court. The court may hold a hearing to determine the issue of classification. The court may uphold the classification of the board, or, if the court finds by a preponderance of the evidence that the sexual offender is not placed in the appropriate classification level, the court shall place the sexual offender in the appropriate risk assessment classification. The court's determination shall be forwarded by the clerk of the court to the board, the sexual offender, the Georgia Bureau of Investigation, and the sheriff of the county where the sexual offender is registered.

(Emphasis supplied.)

satellite-based monitoring requirement was imposed, and (ii) has also completed any period of probation, parole, or post-release supervision imposed as part of the sentence").[7] Instead, OCGA § 42-1-14 (e), on its face, simply allows for

[7] We reject the reasoning in Belleau v. Wall, 811 F3d 929, 937 (7th Cir. 2016), which concluded that sex offenders had a diminished expectation of privacy and went on to note that the Wisconsin statute involved allowed sex offenders subject to lifetime monitoring to "file a petition requesting termination of lifetime tracking . . . 20 years after the date on which the period of lifetime tracking began." As we have concluded in Division 2 (b) (i), supra, individuals classified as sexually dangerous predators who have served the entirety of their criminal sentences do *not* have a diminished expectation of privacy with respect to Fourth Amendment searches. See H. R. v. N. J. State Parole Bd., 2018 N.J. Super. LEXIS 175 (Super. Ct. App. Div. Dec. 20, 2018) ("[W]e decline the State's suggestion that we follow Belleau, wherein both Judge Posner, writing for the court, and Judge Flaum, concurring, concluded that GPS monitoring did not violate the Fourth Amendment rights of a 72-year-old offender who had long ago completed his sentence and was not on parole, but who was subject to Megan's-Law-type registration and disclosure. Judge Posner's view that the loss of privacy suffered under GPS monitoring is slight . . . is at odds with our [New Jersey] Supreme Court's assessment . . . that GPS monitoring substantially diminishes individual privacy."). See also Jones, supra, 565 U. S. at 415-416 (Sotomayor, J., concurring). We also are not persuaded that an opportunity to be removed from GPS monitoring requirements through reclassification after 20 years would make reasonable a search of an individual who has no diminished expectation of privacy after having served his or her entire sentence. See H. R. v. N. J. State Parole Bd., supra (concluding that continuous GPS monitoring of sex offender who had "completed his sentence and [was] not subject to continuing parole supervision . . . [was] an unreasonable search" that did not qualify as a proper "special needs" search in light of an individual's right to be free from unreasonable searches under the New Jersey State Constitution).

warrantless searches of individuals — that these individuals must pay for[8] — to find evidence of possible criminality for the rest of their lives, despite the fact that they have completed serving their entire sentences and have had their privacy rights restored. See OCGA § 42-1-14 (e) (3).

We find such searches to be patently unreasonable, and therefore conclude that OCGA § 42-1-14 (e) is unconstitutional on its face to the extent that it

---

[8] While not necessarily directly connected to the reasonableness of the actual search conducted through a GPS monitoring device, both the Wisconsin and Georgia monitoring statutes contain terms that deal with a sex offender's responsibility to pay for the GPS monitoring device. Compare OCGA § 42-1-14 (e) with Wis. Stat. Ann. § 301.48. However, unlike OCGA § 42-1-14 (e), which simply states that the monitored individual "shall pay the cost of such [GPS] system," Wis. Stat. Ann. § 301.48 provides a process for determining how much the person being monitored "is *able* to pay." (Emphasis supplied.) Wis. Stat. Ann. § 301.48 (4) (a)-(d). The nature of Georgia's monitoring statute could raise issues in situations where an individual is financially unable to comply with the requirement that he or she pay for the GPS monitoring device. For example, it is unclear in the Georgia statute what would happen if an individual does not pay for the GPS monitoring device, and the State has cited to no precedent for making citizens pay for the State to search them. However, if the failure to pay for the system resulted in the system being turned off due to an individual's lack of payment, for example, this would seem to raise a potential issue with regard to whether that individual was "knowingly and without authority . . . circumvent[ing] the operation of an electronic monitoring device" in violation of OCGA § 16-7-29 (b). Similar issues with respect to potential criminal tampering would seem to also be implicated if an individual failed to charge the GPS monitoring device and it ran out of battery power or if the device were damaged from being submerged underwater.

authorizes such searches of individuals, like Park, who are no longer serving any part of their sentences in order to find evidence of possible criminal conduct. See, e.g., State v. Griffin, 818 SE2d 336 (N.C. Ct. App. 2018) (absent evidence that satellite-based monitoring was effective, court-imposed 30-year satellite monitoring of a sex offender that gave no chance for offender to be removed from monitoring requirements violated Fourth Amendment and presented privacy intrusion "greater than the intrusion imposed" by lifetime satellite based monitoring "which [was] subject to periodic challenge and review" under North Carolina law).

Judgment affirmed in part and reversed in part.  Nahmias, P. J., Benham, Blackwell, Boggs, Peterson, Bethel, Ellington, JJ., and Judge J. Wade Padgett concur. Warren, J., disqualified.

BLACKWELL, Justice, concurring.

The General Assembly has determined as a matter of public policy that requiring some sexual offenders to wear electronic monitoring devices linked to a global positioning satellite system promotes public safety, and it enacted OCGA § 42-1-14 (e) to put that policy into practice. The Court today decides that subsection (e) is unconstitutional, and I concur fully in that decision, which is driven largely by our obligation to faithfully apply the principles of law set forth by the United States Supreme Court in Grady v. North Carolina,      U. S.      (135 SCt 1368, 191 LE2d 459) (2015). I write separately, however, to emphasize that our decision today does not foreclose other means by which the General Assembly might put the same policy into practice.[9]

Our decision rests in significant part on the fact that subsection (e) requires some sexual offenders to submit to electronic monitoring even after

_____

[9] It also should be emphasized that nothing in our decision today precludes the enforcement of other provisions of the Sexual Offender Registration Review Board Act, OCGA § 42-1-12 et seq., including its registration requirements (OCGA § 42-1-12 (f)) and its provisions limiting the places to which certain sexual offenders may go (OCGA § 42-1-15).

they have completed the service of their sentences. But nothing in our decision today precludes the General Assembly from authorizing life sentences for the worst sexual offenders, and nothing in our decision prevents the General Assembly from requiring a sentencing court in the worst cases to require GPS monitoring as a condition of permitting a sexual offender to serve part of a life sentence on probation. Indeed, Georgia law already provides that persons convicted of forcible rape, felony aggravated child molestation, felony aggravated sodomy, and aggravated sexual battery must be sentenced to either imprisonment for life or imprisonment for a term of years followed by probation for life. OCGA § 17-10-6.1 (b) (2). And Georgia law already provides that a sentencing court may require as a condition of probation that an offender "[w]ear a device capable of tracking the location of the probationer by means including electronic surveillance or global positioning satellite systems." OCGA § 42-8-35 (a) (14). Nothing in our decision today calls the constitutionality of these sentencing laws into question. Likewise, nothing in our decision precludes the General Assembly from considering whether the statutory requirement of life sentences for certain sexual offenses ought to be extended to other offenses

2

and other offenders or whether GPS monitoring ought to be absolutely or presumptively required in certain cases as a condition of probation.

To be sure, there are limits to this approach. For instance, statutes that expose offenders to greater punishments can be constitutionally applied only prospectively, and no criminal sentence can constitutionally impose cruel and unusual punishment. But our decision today does not foreclose the possibility that the General Assembly could (at least prospectively) authorize or require that the worst sexual offenders be subjected to GPS monitoring for life as a condition of a sentence of probation for life.[10]

I am authorized to state that Justice Boggs, Justice Bethel, and Judge J. Wade Padgett join this concurring opinion.

---

[10] It may also be possible for the General Assembly to revise the Sexual Offender Registration Review Board Act to provide constitutionally for the GPS monitoring of certain sexual offenders. With respect to the potential rehabilitation of the Act, however, it is worth noting that other serious constitutional concerns about the Act    separate and apart from the constitutional problem that forms the basis of our decision today    have been raised in this and other cases. Our decision expresses no opinion about whether those other concerns are well-founded.

3

Decided March 4, 2019.

OCGA § 42-1-14 (e); constitutionality. DeKalb Superior Court. Before Judge Flake.

Robert H. Citronberg; Mark A. Yuracheck, for appellant.

Sherry Boston, District Attorney, Vincent J. Faucette, Anna G. Cross, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Rebecca J. Dobras, Tina M. Piper, Assistant Attorneys General, Sarah H. Warren, Solicitor-General, Andrew A. Pinson, Ross W. Bergethon, Deputy Solicitors-General, for appellee.

4